## Near *against* Watts.

8w 319
196  105

Since the passage of the act of the 16th of June 1836, a life estate in lands is not the subject of levy and sale upon an execution.

The judgment creditor who first proceeds by execution against a life estate in lands, and has the same delivered to him upon a *liberari facias*, is entitled to the rents and profits thereof in satisfaction of his judgment, to the exclusion of another judgment creditor, the lien of whose judgment is prior in point of date, but whose execution is subsequent.

ERROR to the common pleas of *Cumberland* county.

Frederick Watts, Esquire, against Dr L. L. Near. Amicable action.

The parties agree to the following facts, to be considered in the nature of a special verdict, with leave to either party to sue out a writ of error without oath or bail.

On the 2d of August 1837, Dr L. L. Near obtained a judgment against Dr William C. Chambers for 11,645 dollars, upon which a *fieri facias* was issued the same day, and was levied on personal property, which was sold to the amount of 9185 dollars 80 cents. On the 22d of November 1837, a *fieri facias* was issued for the residue, which was levied on the life estate of Dr William C. Chambers in a tract of land and mill. An inquisition was held, and the jurors, taking into consideration the value of the property and the expenses for taxes and repairs, only found the annual value to be 404 dollars. There was no judgment but that of Dr Near exhibited to the jury. On the 8th of February 1838, a *liberari facias* was issued, which was executed; and on the 12th of February 1838, the possession of the said property was delivered to the plaintiff in the execution.

On the same 2d of August 1837, F. Watts, Esq., obtained a

judgment against Dr William C. Chambers for 1925 dollars 50 cents, upon which a *fieri facias* was issued on the 7th of August 1837, and which was levied on all the defendant's real estate, embracing several tracts of land and lots of ground, and also the life estate of the said Chambers in the tract of land and mill before mentioned.    On the 26th of August 1837, Dr W. C. Chambers signed an agreement, that the property thus levied should be considered as condemned, without inquisition.    On the 1st of September 1837, a *venditioni exponas* was issued, which was returned on the 20th of November 1837, that all the property was sold, including the life estate aforesaid; the sales amounted to 22,738 dollars.

On the 13th of November 1837, Dr L. L. Near, by his counsel, filed exceptions to the sale of the said life estate, and on the 20th of November 1837, he filed additional exceptions; and the said sale of the life estate was set aside, on the ground that it was not the subject of sale.    On the 15th of December 1837, on motion of Dr Near, by his counsel, rule—that the proceeds of the sheriff's sales be brought into court for appropriation; and on the 10th of February 1838, the money was appropriated; and after paying all previous judgments, there was a balance to be applied *pro rata* to the judgments of the said Dr Near and F. Watts, Esq., of 336 dollars 34 cents, and the same was so paid.

On the 24th of February 1838, a *fieri facias post venditioni exponas* was issued upon the judgment of F. Watts, Esq., *v.* Dr Chambers, which was levied on the life estate of the defendant in the aforesaid tract of land and mill, upon which an inquisition was held, and the jury, upon the judgment of F. Watts, Esq., none other having been exhibited, and evidence of the taxes and repairs, as in the case of Dr Near, returned that the property was of the annual value of 404 dollars.

And a conversation was had and moved by and between the said Dr L. L. Near and the said Frederick Watts, on the subject of the said judgments, executions and life estate, wherein the said Dr Near affirmed that the proceedings had upon his judgment, by which he was put in possession of the said life estate, entitled him to the exclusive possession and receipts of the profits of the said estate until his debt was paid; and by reason of having the first *fieri facias*, levy and inquisition, and *liberari facias* executed as aforesaid, he could not be dispossessed or disturbed in the possession or exclusive receipt of the profits of the said estate until his debt was paid; and that it was unlawful for the said F. Watts to institute any proceeding upon his judgment, by which he would be entitled to any part of the annual value of the said life estate until Dr Near's judgment was satisfied; and the said F. Watts denied that the said Dr L. L. Near was *lawfully* entitled, under the proceedings upon his judgment, to have the exclusive possession and receipt of the annual profits of the said life estate; and

[Near v. Watts.]

that it would be lawful for him, the said F. Watts, to have the said inquisition and *liberari facias* set aside, and to proceed upon his judgment under the act of assembly in such cases provided, in such manner as that the annual profits of the same should be applied and distributed, *pro rata*, to and between the said judgments of the said F. Watts and the said Dr L. L. Near. And the said Dr Near, in consideration of the said F. Watts having promised to pay him five dollars, in the event of his being entitled to proceed in such manner as to entitle him to a *pro rata* of the annual value of the said life estate, the said Dr Near promised to pay him, the said F. Watts, five dollars in the event of his not being entitled to the whole amount of the proceeds of the said life estate, and the exclusive possession of the same until his debt is paid. And the said F. Watts thus affirms and the said Dr Near denies. Issue.

And the parties hereby admit the premises and assumptions there laid, and refer the matter to the court. If the court shall be of opinion that the said F. Watts may lawfully proceed upon his judgment, in any manner to entitle himself to a portion of the annual value of the said life estate, before the judgment of the said Dr Near shall be fully satisfied, then judgment to be entered for the plaintiff; but if the said Dr L. L. Near is entitled to have the whole proceeds and possession of the said life estate until his debt be fully paid, by reason of the proceedings so as aforesaid had upon his judgment, then judgment to be entered for the defendant. The parties agree to waive all matters of form in this case, the object being to ascertain whether, upon all the facts of the case, Dr Near's proceedings upon his judgment are legal and valid, so that the same should not be set aside, and so as to preclude the said F. Watts from proceeding in any manner upon his judgment, so as to entitle himself to a *pro rata* share of the annual value of the said life estate. The records herein referred to are made part of this case, &c., &c., &c.

Upon this statement of facts, the court below rendered a judgment for the plaintiff.

*Penrose*, for plaintiff in error, contended that by the construction of the sixty-ninth section of the act of the 16th of June 1836, the execution of the plaintiff in error was entitled to a preference, and that the rights of the parties were not controled by the subject of the lien of their respective judgments. He referred to the sixty-ninth section, which provides that the plaintiff may have a writ of *liberari facias*, according to the valuation of the inquest, " in the manner and according to the rules herein before provided in the case of other real estate," and the fifty-first and fifty-fourth sections, which regulate the proceeding against a fee simple estate, provide that a *liberari facias* subsequently issued shall disturb a possession under a former one, although upon a judgment of more recent date.

VIII.—2 c

[Near v. Watts.]

*Watts*, for defendant in error, contended that any other construction of the act of assembly than that given by the court below, would be destructive of the rights of the parties as ascertained and secured by the lien of their judgments. If a subsequent judgment creditor may, by a prior execution, secure to himself the life estate of the defendant until his judgment be paid, it virtually destroys the rights of the prior judgment creditors; for the rents and profits may not be sufficient to pay such subsequent lien during the lifetime of the defendant. That the legislature did not design such a construction of the act as is contended for, appears by a reference to the sixty-eighth section, which provides that " the sheriff shall ascertain, by an inquest in the manner usually practised, the clear yearly profits, making reasonable allowances for taxes, repairs *and all reprises,* and he shall make return," &c. " Beyond all reprises," in the language of the act of 1705, sect. 2, *Purd. Dig.* edition of 1830, page 289, which includes *mortgages,* as decided in Pulaski *v.* King, 1 *Yeates* 477. It would seem, therefore, that the inquest should have considered prior judgments against the life estate. But the same act, in the seventieth section, provides, that upon the appointment of the sequestrator provided for by the sixty-ninth section, he may, under the direction of the court, sell the land " for such term of years as will satisfy all the liens;" and in another part of the same section, " and the liens shall be paid according to priority." We can not suppose that it was the intention of the legislature to compel lien creditors immediately to execute their judgments which are secured upon life estates, or run the risk of being deprived entirely of their security, by a proceeding upon a judgment, for the payment of which, perhaps, the estate afforded no security.

The opinion of the Court was delivered by

KENNEDY, J.—The plaintiff in error and the defendant in error having each obtained a judgment for a sum of money in the court of common pleas of Cumberland county, on the same day, against Doctor William C. Chambers, who was seised of a life estate at the time, in a tract of land on which a grist mill and other buildings were erected, sued out upon their respective judgments writs of *fieri facias* tested of and returnable to different terms of the court; by virtue whereof the life estate of the defendant in said land was seised in execution. The plaintiff in error took out his writ of *fieri facias* on the 22d of November 1837, under which the sheriff, having taken the land in execution by means of an inquest consisting of twelve suitable men, ascertained the clear profits yearly thereof, after making reasonable allowances for taxes, necessary repairs, and all reprises, without taking into view, however, the judgment of the defendant in error, or that of any other person, except the judgment in the *fieri facias* itself, to be 404 dollars; and, as he was commanded, made return thereof to the court with his writ; where-

upon, on the 8th of February 1838, the plaintiff in error sued out a *liberari facias*, by virtue of which the estate so taken in execution was extended and delivered to him according to the valuation of the inquest aforesaid. After this, on the 24th of February 1838, the defendant in error sued out a writ of *fieri facias* upon his judgment, and the same life estate was seized in execution under it, a like proceeding to ascertain the value of the yearly profits, and a like return thereof made to the court by the sheriff with the writ. The other circumstances mentioned in the case are passed by, as not having any material bearing upon the question presented for our consideration. The question to be determined is this: Has the plaintiff in error acquired a right, by his priority of proceeding in obtaining execution of his judgment, to have it first satisfied out of the rents, issues, and profits of the estate, before the defendant in error shall be permitted to come in and receive or get therefrom any portion of his judgment?

This question will be answered by ascertaining the true meaning and intention of the legislature, as expressed in the 68th, 69th, and 70th sections of the act of the 16th of June 1836, relating to executions. The first of these sections enacts that, "Whenever an estate for life in any improved lands or tenements yielding rents, issues, or profits, shall be seized in execution, it shall be the duty of the sheriff to ascertain, by an inquest in the manner usually practised, the clear profits yearly of such real estate, making reasonable allowances for taxes, necessary repairs, and all reprises, and he shall make return of such inquisition to the court, with his writ." The second of these sections then directs that, "Upon the return of such writ, it shall be *lawful for the plaintiff* to have such estate extended, and delivered to him by a writ of *liberari facias, according to the valuation of the inquest aforesaid*, in the manner and *according to the rules hereinbefore provided in the case of other real estate*, or at *his* election, the court shall award a writ to sequester the rents, issues, and profits of such estate, and appoint a sequestrator to carry the same into effect." The rules referred to in this latter section, as regulating the manner of extending and the right under such extent of holding other real estate, are contained and laid down in the 51st section of the act, and there have reference only to the extension of estates in fee. The section is in these words: "Lands or tenements shall be extended, as aforesaid, upon execution, according to the priority of the judgments, in all cases where *two* or *more* writs of *liberari facias* issued thereon, shall be in the hands of the sheriff or other officer *at the time* for execution, but whenever any *real estate shall be extended in satisfaction of any judgment*, as aforesaid, such *extent shall not be disturbed* or *discharged* by virtue of any writ of *liberari facias* issued upon any other judgment, whether *previously* or *subsequently* obtained." From these sections it appears that, by the 68th, the sheriff, by means of an inquest to be held in the *manner usually*

*practised,* is to ascertain the clear yearly value beyond all reprises of the profits of the life estate, seized by him in execution, and make return of the inquisition containing the report thereof to the court. The words in this section, "by an inquest in the manner usually practised," mean nothing more than that the inquest shall be composed of twelve good and lawful men, of the sheriff's bailiwick, or at least not of a less number, to be convened and organised by the sheriff, by his either swearing or affirming each member thereof, in the manner and form theretofore usually practised, to perform the duty faithfully assigned and appointed by the section. It is evident this is required, that the creditor, the plaintiff in the execution, as also the debtor and all others concerned therein, may know at what rent or sum of money *per annum* the creditor shall take the estate, until his debt shall thereby be discharged upon an extent of the estate, if he should choose or make his election to take it in that way; and, at the same time, to supersede the necessity of calling an inquest to assist in the future execution of the writ of *liberari facias,* which was requisite, according to the practice that prevailed anterior thereto, for the purpose of fixing the rent or annual value of the estate, at which it should be held or possessed by the plaintiff, until he should receive satisfaction therefrom for his debt. Hence it is also perfectly evident that the inquest mentioned in this 68th section of the act, in ascertaining "the clear profits yearly of the estate, making reasonable allowances for taxes, necessary repairs, and *all reprises,*" are to be governed by the same rules which ought to have guided, and to take nothing into consideration in forming their estimate thereof, but what would have been proper for an inquest previously thereto to have done in executing a writ of *liberari facias.* The object of ascertainment being precisely the same, the principle of coming at or reaching it must of course be the same. And as the term "reprises" in executing a writ of *liberari facias,* was never made nor understood to include judgments or other lien debts, besides the one mentioned in the execution, and as such to be taken into consideration by the inquest, it cannot be intended that it was meant that they should be by the inquest mentioned in the 68th section of the act, whose duty, as there pointed out, would seem to be the same. The argument, therefore, which has been urged in favour of the defendant in error, that his judgment, and indeed, all the judgments in being against Doctor Chambers, which were liens upon the estate at the time, ought to have been adduced and exhibited to the inquest in the case of the plaintiff in error, is wholly without foundation; or, if there be any reason for it, I am altogether unable to discover or comprehend it. The inquest was only to ascertain the clear yearly value of the estate, after defraying·all expenses and charges usually incident to, and necessary for the enjoyment thereof; and how a knowledge of the judgments and liens, or the aggregate thereof, against the estate, could be requisite for the purpose, seems to be

inconceivable. Even the amount of the judgment of the plaintiff in the execution was not necessary to be known to the inquest for all that they were required to do. They were not to ascertain, as in the case of a fee-simple estate taken in execution, whether the yearly value of the rents, issues, and profits thereof, beyond all reprises, would, within the space of seven years, be sufficient to satisfy the amount of the debt and damages, or damages mentioned in the execution, together with the interest and costs accrued thereon. In this latter inquiry, which is only to take place in the case of a fee-simple estate taken in execution, it is perfectly obvious that the amount of the judgment mentioned in the execution becomes material; and that, without knowing it, it would be impossible for the inquest to decide within what period the rents would be adequate to the discharge of it. So in making the requisite inquiry in this latter case, they may also, and it would be their duty, if the same should be laid before them, to take into consideration all the liens existing against the estate, that are or shall become payable within the seven years, as composing in this particular instance a portion of what has been considered *reprises;* because, unless the aggregate of the rents, issues, and profits of the estate for the seven years, beyond the amount of all such liens, including also what shall be deemed necessary to meet repairs and the discharge of all public assessments thereon, will pay the amount of the judgments mentioned in the execution within that time, the inquest make no report in this inquisition of their estimate of the yearly value of the profits of the estate, nor yet of the amount of the liens exhibited, but merely state that the rents, issues, and profits of the estate taken in execution are not of a sufficient yearly value, beyond all reprises, to satisfy the same within the space of seven years. And before the act of 1836 came into operation, the inquest held under the writ of *fieri facias* were only required to state in their inquisition, either that the yearly rents, issues, and profits of the estate, beyond all reprises, *were* or *were not* of a sufficient value to satisfy the amount of money to be levied under the writ, without stating the yearly value of the profits or making any mention of the liens or their amount. But since that act has come into effect, they are required by the 48th section thereof, in case they should be of opinion that the clear profits of the estate will be sufficient to pay the amount of money to be levied under the execution, within the seven years, to assess the value of the yearly rents or profits of the estate beyond all reprises of which the sheriff shall make return to the court, with his writ; so that the creditor or the plaintiff in the execution, if he chooses, thereupon, to sue out a writ of *liberari facias,* in order to have the estate extended and delivered to him, may, as well as the defendant, know what rent or sum of money the former shall allow to the latter *per annum* for the enjoyment of the estate in satisfying his debt or judgment; and also that the trouble and expense of calling

VIII.—2 c*

an inquest for that purpose, in the execution of the writ of *liberari facias*, might thereafter be avoided. If the inquest, however, should be of opinion that the rents, issues, and profits of the estate will not be sufficient to pay the amount of the execution beside the aggregate of all the liens, within the space of seven years, then they are barely to say so, in their inquisition without more, as before the act. And thereupon the plaintiff becomes entitled to have a writ of *venditioni exponas* sued out, authorising the sheriff, or proper officer, to make sale of the estate for the purpose of satisfying his debt. But in the case of a life estate being seized in execution, no such writ can be issued; nor can a sale be made of it, unless the *plaintiff* or *creditor*, in whose favour the seizure has been made under the *fieri facias*, upon the return thereof to the court, will *elect* to have the estate sequestered; which, we have seen, he, and no other, has an express right under the act to do. Upon his electing to have the estate sequestered, the court is required to award a writ of sequestration to sequester the rents and profits of the estate, and to appoint a sequestrator to carry the same into effect, who shall have power under the authority of the court either to rent or sell the estate, and to apply the proceeds thereof, under the direction of the court, to the payment of liens according to their priority. But it is only in the case of a sequestration of a life estate that the liens upon it are to be brought into view and taken notice of; and this, by the express terms of the 70th section of the act, is to be done by the court; so that in no instance where a life estate is seized in execution, have the inquest any thing whatever to do with the liens. They cannot, as has been insisted on, be considered as comprehended within the term "reprises," as used in reference to the ascertaining, by means of an inquest, the value of the *clear profits yearly* of the estate, as it has been held they may in ascertaining whether the value of the rents, issues, and profits of the estate in fee, beyond all reprises, will be sufficient, *within the period of seven years*, to satisfy the amount of money directed to be levied under the execution; because the object in this latter case is to ascertain whether the whole profits of the estate will be sufficient, within that period, to *pay all the liens* against it, including the amount of the execution, besides the expense of keeping it in repairs, and paying the public assessments thereon. What would be the result if the amount of liens were to be taken into view, as reprises, in ascertaining the *yearly* value of the estate after paying them? Is it not manifest that, whenever the aggregate of the liens, payable within the year, exceeded the value of the whole profits of the estate for the year, the clear value of it, or the value beyond reprises would be nothing? This would be imputing to the legislature a want of ordinary intelligence, and making the provisions of the act in this respect perfectly ridiculous, if not unrighteous; because it may admit of a question, perhaps, where the estate does actually yield rents, issues, and profits,

notwithstanding the inquest, according to the rules contended for by taking into consideration, as reprises, all the liens, have found the clear yearly value of the profits to be worth nothing, whether the plaintiff in the execution would not have a right to sue out a writ of *liberari facias*, and by virtue thereof, have the estate extended and delivered to him; if so, he must hold it forever, as the profits according to the report of the inquest can never satisfy his debt. But it is obvious that this might produce the grossest injustice; for the profits of the estate exclusive of the liens upon it, beside defraying the expense of repairs, taxes, and such charges as are usually incident to the profitable occupation of real estate, might be more than sufficient to discharge the plaintiff's debt or claim in one year.

The true and, as it would seem, the necessary interpretation of the act, so far as noticed, being, then, that the liens generally against the estate are not to be taken into view by the inquest, in ascertaining the *yearly* value of the profits thereof, let us apply it now to the case before us. The plaintiff in error had the estate extended and delivered to him, that he might, from the rents and profits of it, according to the valuation thereof, made by the inquest, receive satisfaction of his debt, before the defendant in error sued out his execution. The plaintiff in error must be considered then as having been put into the possession of the estate, and as having a right to hold the same according to the rules laid down in the 51st section of the act, recited above. This section declares expressly, that " whenever any real estate shall be extended in satisfaction of any judgment as aforesaid, such extent shall *not be disturbed or discharged* by virtue of any writ of *liberari facias*, issued upon any other judgment, whether *previously* or *subsequently* obtained." Hence it is evident that the defendant in error, even if his judgment were prior to that of the plaintiff in error, could not disturb the plaintiff in error in his possession of the estate, nor be permitted to participate in the receipt of any of the rents, issues and profits of it, until the plaintiff in error shall be satisfied therefrom the amount of his debt, with the interest and costs, which have and shall accrue thereon. And still less reason has the defendant in error, according to this principle, to claim to come into a participation of the profits with the plaintiff in error, seeing his judgment is not prior, but scarcely of equal date. And again, by the 70th section of the act, it is only where a sequestrator is appointed by the court, with power, under its direction, to rent or sell the estate, that the rents or proceeds of sale are to be applied to the payment of any of the other liens besides that on which the estate is taken in execution; and in that case they are to be applied to the liens according to their priority. But then by the express terms of the 69th section, there can be no sequestration of the estate or profits of it, nor sequestrator appointed, without the consent or election of the plaintiff, under whose execution the estate has been first seized. The words of the section are, " at *his election* (meaning the plaintiff's, beyond doubt) the court

shall award a writ to sequester the rents, issues and profits of such estate, and appoint a sequestrator to carry the same into effect." But here the plaintiff in error, who had the first execution laid on the estate under his judgment, made his election, as he had a right to do, to have it extended and delivered to him, at the valuation thereof made by the inquest, under the writ of *fieri facias*, which gives him a right to hold it, without disturbance from any other creditor, according to the provisions of the 69th and 51st sections of the act, until he shall be satisfied the amount of his judgment by the rents, issues and profits, to be derived from the estate, which have been extended to him at 404 dollars per annum by the inquest. It has been objected, however, that this is so unreasonable and unjust, that the legislature could not have intended it. It is very clear, however, that they have most expressly and unequivocally declared that it shall be so; and this being the case, it is our duty to be governed by it in our decision, even if it were unreasonable; because we have no power to alter, repeal, or set it aside. I, however, am far from being satisfied that the act, in this respect, according to the only interpretation which we think it susceptible of, is so unreasonable or unjust as has been alleged on the part of the defendant in error; and as regards this particular case, the English rule, as applicable to the execution of a writ of *elegit*, which may be considered as founded on experience, and approved of by the wisdom of many ages, would entitle the plaintiff in error to a preference over the defendant in error. Chief Baron Gilbert, in his Treatise upon Executions, page 56, says: "If there be several judgments in the *same* term, the second person that first extends the several moieties, shall be first satisfied, all being equal as to the date of their liens." So as to an estate in fee, taken in execution under the provisions of the act of 1836, which go still further than the English rule, it is admitted, without any objection of its being unjust, that the plaintiff, who has it first extended and delivered to him that he may have his judgment satisfied out of the profits of it, cannot be disturbed until he shall have obtained satisfaction of his debt, though his judgment and the lien of it be posterior to that of others who may wish to come in. But it is said, this is different from the case of a life estate, because a fee simple estate will endure forever, and when it is seized in execution, and extended under a junior judgment and lien, it amounts only to a postponement of the prior judgment and lien for a limited time, not exceeding seven years at most. Although the effect of this operation may occasionally be different in the case of a life estate, from what it would be if it were a fee, yet the principle, in the abstract, is precisely the same in both cases; which is this, that the party who has a lien of a prior or equal date, loses the benefit of it by neglecting to take the estate first in execution. It may therefore be said to be carrying into effect a principle of the common law, which certainly favours the vigilant, and often does postpone the negligent. This principle prevails in

the taking of chattels in execution, both as to real and personal, so that the first of several executions, issued against the same person, which is delivered to the sheriff, though it be issued last, upon the latest judgment, shall be entitled to a preference, and must be first satisfied out of personal goods or a term of years in land, if taken in execution by virtue of the several writs, after they shall all have come into the sheriff's hands. It is not material, either, how long the term may have to run; it may be one hundred years or more; nor yet what the relation of the rent reserved may be to the real annual value of the land. The rent may be nominal, such as a grain of corn, and the clear yearly value of the rents, issues and profits of the land, may be five hundred dollars, or any other sum; thus making it, in fact, a much more valuable estate than a life estate in the same land would be, and at the same time equally permanent.

We, therefore, think the court below erred in rendering judgment for the defendant in error, who was the plaintiff there.

Judgment reversed, and judgment for the plaintiff in error.